## N. O., J. & G. N. R. R. Co. *v.* John P. Hughes.

1. General Principle of Liability.—The general principle which prevails in England, and most of the American States, is, that a servant accepting employment for the performance of specific duties, takes upon himself the natural and ordinary perils incident to the service, of which, are exposures from the negligence of fellow-servants in the same common employment. Priestly v. Fowler, (in 1837) 3 Mees. & Welb., 1; Murray v. R. R. Co., (in 1841) 1 McMillan, 398.

2. Liability of Company to Employes for Conduct of Fellow-Employes.—Where there are several servants or agents, each stipulates for the performance of his several part, they are not liable to the company for the conduct of each other, nor is the company liable to one, for the misconduct of another. Farrell v. R. R. Co., 4 Metcalf, 49.

3. Railroads—How Liable for Acts of its Agents.—If the injury results from the negligence or misconduct of an agent of a railroad company, liability upon the

company can be imposed, by showing incompetency of the agents, and the want of reasonable care and prudence in his selection or his continuance in place, after notice of his unfitness.

4. WHO ARE FELLOW-SERVANTS WITHIN THE RULE.—Those who are co-working in the same common enterprise ; under the same master and compensated by him. Differences in wages or work, do not effect the question if the general business is the same. Wilson v. Madison R. R. Co.. 18 Ind., 226 ; Paston v. R. R, Co., 4 Jones, (N. C.) 247 ; Coon v. R. R. Co.. 5 N. Y., 492.

5. EFFECT OF ART. 43, CODE 1857.—This statute does not embrace, nor was it so intended, the agents and employes of a railroad company, but they stand upon their common law rights. Sullivan v. M. & M. R. R. Co., 11 Iowa, 421 ; Carle v. B. & C. R. R. Co., 43 Maine, 269.

6. ERRONEOUS INSTRUCTIONS.—The court below erred in granting the first and third instruction, because they assume that the plaintiff can recover, if the injury may be referred to the carlessness of other agents and servants of the defendant, employed in a department distinct from that in which the plaintiff was engaged and over whom he had no control. Coon v. R. R. Co., 1 Seld., 492 ; Hayes v. Western R. R. Co., 3 Cush. 270.

Error to the circuit court of the first district of Hinds county. Hon. GEORGE F. BROWN, Judge.

On the 14th of August, 1871, appellee instituted in the court below, an action of trespass on the Case v. Appellants, alleging that he had been in the employment of the said company, as engineer on a passenger train, running over the whole road; that, whilst so employed, and without any neglect on *his* part, but through the neglect, carelessness and omission of duty on the part of the R. R. company, in suffering the cross-ties and structure of the railroad to become rotten, dangerous and unsafe, the locomotive and tender conducted and managed by appellee, were thrown from the track, by the spreading of the track, by which he was greatly injured and crushed in body, and rendered, thereby, forever incapable of afterwards pursuing his profession of locomotive engineer. The damages were laid at $30,000.

After due service of process, the appellants, at the return term, filed a demurrer to the declaration, stating the following grounds of demurrer: 1st, That plaintiff below, being a mere servant of the railroad company, had no right, in law, to recover for the occurrence related in the declaration. 2d, That the declaration shows that the *run-off* was caused by the fellow-servants of plaintiff, and by *their* neglect. 3d,

That the declaration does not aver any default or negligence on the part of appellants, whereby the accident was produced.

This demurrer was overruled, and leave given to plead within thirty days.

At May term, 1871, defendants below filed a plea of the general issue, to which was appended a *notice* of the special matters which they would prove under the plea.

Plaintiff below, likewise gave notice, in reply, that he would offer proof in support of all his averments in the declaration, and to show that the injury was caused by neglect on the part of the company, by their agents and servants, employed in a department of labor distinct and separate from that in which plaintiff below was engaged.

After one continuance of the case, defendants below, at September term, 1872, filed an affidavit and made a motion for a continuance of the case, for reasons set forth in the affidavit, which motion was overruled, and thereupon a jury was impanneled to try the case. A special bill of exceptions was thereupon filed to the order of the court, overruling the motion for a continuance of the case.

After plaintiff below had closed his evidence, defendants below offered to read, on their part the whole deposition of one T. S. Williams, but plaintiff objected to the reading of certain portions thereof, which objection was sustained, and the objectionable part of said deposition was excluded. To that order of the court below, defendants excepted, and filed their special bill of exceptions, in which is embraced the whole deposition of said Williams, with a designation of that portion of said deposition which was thus excluded from the jury.

After several days, during the investigation, and after the jury had been adjourned from day to day, they finally, on the 13th of September, 1872, rendered a verdict for plaintiff below, and assessed his damages at the sum of seventeen thou- and five hundred dollars ($17,500). Various instructions were given to the jury, before the argument of the

case, on the part of both parties, some being modified and some refused; all of which instructions are contained in the record, with a statement of the disposition made of them by the court.

Defendants below made a motion for a new trial, based upon the following grounds: 1st. That the verdict is exces-sive. 2d. That the court erred in giving instructions for plaintiff below, and in refusing and modifying instructions asked for by defendants below. 3d. That the verdict is against the law and evidence. 4th. That the court improper-ly forced the defendants to go to trial in the absence of an important witness. 5th. That the court erred in excluding parts of T. S. Williams' deposition.

This motion for a new trial was overruled, and the action of the court excepted to, and a bill of exceptions thereto filed.

Special bill of exceptions No. 3, relates to the action of the court in refusing to permit one Moorman, a witness of defendant's below, to give his mere opinion, from an inspec-tion of the road, at the point where the *run-off* occurred, as to what caused the accident.

Special bill of exceptions No. 4, relates to the giving of instructions for plaintiff below, and to refusing and modi-fying the instructions of defendants below, and in that bill of exceptions (No. 4,) all the instructions, with the action of the court, in giving, refusing and modifying the same, are again set out in the record.

A fifth bill of exceptions, setting forth all the evidence in the case, after the motion for a new trial was overruled, was filed by defendants.

*John P. Hughes*, plaintiff below, testified substantially as follows:

That he was engineer on the train going south, in the night time, running on about the schedule time, say fifteen or twenty miles an hour, at his proper position on the engine, with his hand on the lever, at the time the accident

occurred; that he had, just before, shut off steam and blew down brakes, supposing that a wood yard was near; that the engine and tender ran off the road; the ties at the point being rotton, had spread, and caused the run-off; that witness was badly injured and fainted, but got up and examined the track, to see what caused the run-off; that no warning or signal had been given of the danger; that it had been raining; that witness had no knowledge whatever of the danger at this point, or of the rottenness of the cross-ties; that it is the duty of the section boss to *flag* trains when there is danger; that, had the track been good, the accumulation of sand at this point would not have caused the run-off, as the engine would have run safely through the sand; that a locomotive can go safely through miles of sand six inches deep, when the sand is not much packed and dried, and when the track is in good repair and sound; that engines have been safely run through two feet of sand on the rails; that the track, where the accident occurred, had spread out on one side by reason of the rottenness of the cross-ties; that the hands, that day, had been working on the road there, having put in some fifty or sixty new ties; the section house was three-fourths of a mile from where the run-off occurred; that witness had three of his ribs broken by the accident; was confined for three months to his bed and room; was internally injured—his bladder injured so that urine could not be retained; that he was ruptured on both sides by the accident, on one side permanently; that the accident has rendered witness forever incapable of pursuing his profession of engineer. Witness also said that he was at his station on the engine when the run-off occurred, using all due care, and running only about fifteen miles an hour; that witness has not acted as engineer on any road since receiving said injuries, and never can do so hereafter; that the head-light was burning, but the night was dark, and he could not have seen danger on the track in time to check the train; that, before this accident, he was a stout, healthy, active young man, weighing 190 pounds, and never had

been sick, but is now ruined for life; that witness was a regular engineer, getting a salary of $140.00 a month; that witness has followed engineering some fifteen years; that engineers never stop a train for a few inches of sand on the rails; that it is the duty of the road-master to keep the track in good repair; that engineers have no control over the road-master's department; that the spikes drew out of the cross-ties because the cross-ties were rotten, and the spikes could not hold in consequence; that the run-off occurred in a cut, with banks of sand and clay on each side; that it is the duty of an engineer, when he has cause to suspect danger, to check up and examine: that the section boss, for some cause unknown to witness, was discharged the evening following the accident; that witness is a saloon keeper now, at $80.00 a month; spikes never pull out when the cross-ties are sound.

*William Joe*, witness for plaintiff, testified:

That he is an old road hand, of five years' standing, and worked under section boss Bloxum at the time and place of this accident, and was foreman of the hands there employed; that, on the evening this accident occurred, the hands had been working near that point, raising the track, and quit work about dark; there were a great many rotten ties at that place, which the hands were replacing with new ones; the new ties on hand gave out about noon of that day, before repairs were finished, and a rain, about night, compelled the hands to leave the work unfinished; some old ties were worked in the road bed; the ties put in were merely propped with blocks, and the earth not filled in between the ties, as should have been done, to make the place safe; it rained hard the night that this accident occurred; that the up train, the evening of the night of the accident, passed safely over the road at this point; that Bloxum, the section boss, had been drinking hard the day preceding the night when this accident occurred, and was drunk at night when the unfinished work was left, he having ordered the

hands to *flag* plaintiff's down-coming train that night, or *arouse* him, that *he* might do so; but that all hands were asleep when the train came and ran off, and no one gave any signal or flagged the train; that it was contrary to orders to leave a dangerous piece of road unfinished because night had set in; the ties, at the place where plaintiff's train ran off, were old, rotten, spongy, and would not hold spikes; after the train ran off, witness went down to the house, and found Bloxum there and *asleep;* Bloxum (section boss) was a drunkard, and was discharged a few days after this occurrence; the rotten ties, and our failure to ram in earth where we worked, caused this accident; Bloxum quit work because of the rain, and said the track there was not safe, but plaintiff's train *might* pass over that night; that the ties at this point were so rotten that they could easily be mashed with a crowbar; that the sand which the rain had that night washed on the rails was not over two or three inches deep, and extended the length of three rails, there being no sand elsewhere on the track; that even a hand-car will go through sand only three inches deep; and that McCanliff, superintendent of the road, came to the place where the wreck was, a short time after the hands went to work, clearing away the wreck; that the run-off occurred at the exact point where the hands had left off work that evening; that the rain that night had softened the earth, and the track sank and the spikes pulled out of the rotten ties; that had the ties been sound, the spikes would have held; that after the accident, witness saw the rotten ties, and the holes whence the spikes had been drawn; that the train ran off near the point where the old rotten ties had been put in that evening.

*James Rivers,* witness for plaintiff below, said:

That he was a hand on the road the day of the accident, working with William Joe, and under section boss Bloxum; the men worked until night, and then quit on account of the rain and cold; Bloxum said that plaintiff's down train,

which was to come that night, ought to be *flagged*, but all hands went to sleep, and the train was *not* flagged; Bloxum was so drunk that night that he had no sense; that witness saw the train next morning off the track, and saw that the ties there were rotten, and that the spikes had drawn out; that witness worked with the hands next day in getting the train on, and we put in fifty new ties at the place; the old ones taken out by the hands were rotted to pieces and would not hold spikes; that the rails were covered with sand by the night's rain; that the place had been bad for two years; it was in a cut a quarter of a mile long, and when it rains sand washes down there; that the sand on the road there would not have thrown the locomotive off; that the sand accumulated on the left rail, and the locomotive went off on the right, where there was no sand on the rail; the sand was some two feet deep on the *track*, and the cross-ties were so rotten that they bent on the ends.

*Dr. C. B. Galloway*, for plaintiff, states in his deposition:

That he is a doctor of medicine, graduated at Louisville, Ky., and is 47 years old, having practiced twenty-six years; that he has known Hughes, plaintiff, at Canton, Miss., for five or six years, and was called to see him, professionally, in November, 1869, and visited him on four several days; that Hughes had three ribs broken near the spine and suffered greatly, and was confined to bed two or three weeks, and to his room from four to six weeks; that Hughes, plaintiff, is badly ruptured, but witness does not know how that was produced; that Hughes is now, in his present condition, wholly unable to follow the business of engineer on a railroad; that Hughes is now ruptured on both sides, cannot lie on the side where the ribs were broken, nor can he stoop on that side, although his *general health* appears to be good; that plaintiff is a married man, with a wife and two children, living in a small cottage residence in Canton; that plaintiff can never be as well capacitated for business, as he was be-

fore this injury occurred; that the rupture of plaintiff is incurable.

*Dr. A. H. Cage*, for plaintiff, testified :

That he is a graduate of Louisiana medical college, at New Orleans; has practiced medicine and surgery for the last fifteen years ; that witness has known plaintiff for five years ; that he was called, professionally, to see plaintiff on the night of 13th November, 1869; that he had been greatly injured in the *lumbar* region, causing intense suffering, two ribs were broken on right side near the spinal vertebra, with paralysis of the neck of the bladder, caused by the injuries he had received ; that those injuries are of a character so to impair the strength of plaintiff, as to render him incapable of following any more, his profession of railroad engineer ; and his rupture is *incurable ;* that witness has seen plaintiff this day, and although his general health is good, his general physical condition is now, as I have above stated the same to have been; that plaintiff lives in Canton, has a wife and two children, and has a small cottage in Canton, but no other property that witness knows of; that plaintiff was for sometime confined to his house in Canton, and then went to Dr. Stone, in New Orleans, to be treated by him ; that plaintiff has suffered very much from his injuries; that witness did not examine plaintiff particularly with reference to his future capacity for business, but witness' answer is based upon plaintiff's condition and his statements to witness of his condition.

*Edward Dawkins*, for plaintiff, testified :

That he is a regular locomotive engineer, and has been for twenty years, having been engaged on many railroads as such; that witness is a thorough engineer, both practically and theoretically ; that, as engineer, he has often run his train through as much as seven inches of sand, having gone back a mile, sometimes, to get up steam to force the locomotive through; that there is a cow-catcher or pilot in front

of the engine, which clears off obstructions on the track, and will scrape off all sand, except a thickness of two or three inches; that the cow-catcher extends two or three inches beyond the iron rails; that locomotives weigh from twenty-five to thirty tons; when sand is not very thick, after the driving wheels pass, nothing would be seen of it, as the cow-catcher would carry most of it off, and the wheels would crush the remainder, for the engine is so heavy that it would crush a copper cent piece, as thin almost, as a waifer; that the *flange* of the wheels is from one to one and a half or two inches deep, and the *flange* would have to be raised to a level with the rails before the engine would run off; that witness has himself run an engine through the very spot where plaintiff's engine ran off, when there was over three inches of sand, and without any pilot or cow-catcher on the engine, with perfect success, and never thought of stopping for the sand; that witness knows this very cut quite well, and knows that, with only six inches of sand there, it would be almost impossible to throw the engine off of the rails, if the cross-ties were sound; that decayed cross-ties cause the spikes to draw and the rails to spread; in clear weather the head-light will throw light from sixty to one hundred and sixty yards, but when the night is dark and stormy, the head-light will only throw light so as to see accumulated sand for fifteen or twenty yards ahead; running at fifteen miles an hour, on a wet track, an engine could be checked in one hundred yards, or, if all brakes were on, it might be checked in sixty yards; it is not the duty of engineers to enquire about the condition of the road, for it is the duty of the road master and foreman to post engineers as to that matter and to *flag* trains when there is any danger; that it takes several feet in depth of sand to break the cow-catcher; that if there were a foot of sand on one rail and none on the other, the cow-catcher would throw the sand off, and the train would pass safely through, if the cross-ties were sound, without any person feeling the jar; witness has, on the Vicksburg and Meridian railroad, run through sand six

inches deep, and from fifty to sixty feet long, and had not a single wheel put off the track; that the wheels of a locomotive will crush three inches of sand, and pass safely through.

*H. S. Wilson*, on the part of plaintiff, testified :

That he is a locomotive engineer by profession, and has been for twenty-six years, and was employed by defendants in the years 1860 and 1861, and knows his profession well, both theoretically and practically; locomotives weigh from twenty-two to twenty-seven tons on defendants' road; the engine plaintiff had charge of weighed twenty-seven tons; that it is the duty of the road master to see that the road is kept in order, and that the section boss keeps his section in order, and that all trains are signaled when there is danger; the section boss is presumed to know every cross-tie in his section, and it is his duty to signal all trains when there is even an apprehended danger; that it is the duty of the engineer to run on schedule time, and keep a good look out, but he is not expected to know anything about the cross-ties, as he cannot see them when running; that he can only know of rotten ties when the engine sinks into them; head-lights cannot indicate how much sand has been washed on the track; the head-lights will shine some one hundred and fifty to two hundred yards, dependent upon their strength; that in heavy rains, sand on the road cannot be seen by head-lights; that the cow-catcher can move away six to eight inches of sand from the road, which may be on the top of the rails, leaving only the two or three inches between the cow-catcher and the rail, when the sand had recently been washed on the rail; the engine could easily pass over six inches of wet sand; that witness has himself run an engine safely through six inches of sand, when the cross-ties were sound; that the top of the rail is not flat, but rounded, and hence helps the wheels to press the sand out of the way; that there is no more fruitful cause for a run-off than rotten ties; that if there were sand on the rails, two feet thick

and forty feet long, the engine would not go *through*, but would stop; that, on a straight track, with sound ties, six inches of sand on one rail would have no effect on the engine; that, if one wheel of the engine were raised by sand it would cause the wheels on that side to throw more pressure on the opposite side, and, if the cross-ties were unsound, the spikes would draw and the road spread, and the engine might go off the track; but if the road was sound six inches of sand on one rail would cause no such opposite pressure as would cause the engine to go from the track; that witness would not stop, at any time, for an embankment of sand not more than six or eight inches thick, for the engine would go through it; that, on a stormy night, it is the duty of the section boss to have his hands on his section all night on the track; that the section boss should know all bad places in his section, and *can* know them if he does his duty; that engineers always rely on road master and section boss, particularly of stormy nights; that T. S. Williams, general superintendent, was a competent officer and careful about seeing that the road was kept in order, and he cautioned all engineers to be particular, especially in storms, and then to stop and examine bridges and culverts, where danger might be apprehended; that it is the duty of the section boss, in stormy nights, always to have a man on the track to watch for danger and to *flag* the coming trains.

*E. L. Erskin*, was then introduced as witness for plaintiff, and testified:

That he, witness, is a regularly educated locomotive engineer, and has been since the year 1855, and is now employed as such by the Vicksburg & Meridian R. R.; that an engine, on a sound, solid track, would safely pass through six or eight inches of sand on the rails. The cow-catcher would take off all the sand but two or three inches in depth; that a train of nine cars would pass through such sand on one rail only, if the track were straight and sound, but, if the sand was very deep, the engine would *stop*, instead of being *thrown from*

the track; that if there be a cut, where sand is continually being washed on the track, the engineer should be informed of danger by the section boss; that, when there is no signal at a cut, the engineer may go right on, but if he *sees* obstacles, he ought to stop, and yet, he is often in the midst of danger, before he can see it.

The plaintiff below here rested his case.

*George Moorman*, for defendants, testified:

That he got on the train which ran off at Canton, the night of the accident; that it was a very stormy night, and rained hard all the way down from Canton; that witness was in the sleeping car when the train ran-off; that very soon after the accident, plaintiff came into the sleeping car, and, in answer to a question asked by some person, as to what caused the accident, said that sand on the track had thrown the train off. Shortly afterwards, witness went forward to see what had occurred, and found that sand, about six inches deep, had covered the cross-ties and rails, extending some forty or fifty yards along the track; that the engine had gone about its own length, after it had mounted the sand, before it went off, carrying the tender with it; that as the sand got deeper the engine diverted to the right, and by its weight had loosened the track and ties from their bed or socket; that witness looked under the baggage car, which was not off, and saw that the cross-ties there were sound, but were torn up a little; saw a few spikes displaced; witness saw where the engine had *mounted* the sand, and had run *on top* of the sand, about the length of the engine, and saw where the engine had gone off against the opposite, or right bank of the road; that witness saw no signs of any fresh work, where the accident occurred; that witness was not in the employment of defendants then, but was so, afterwards; that witness was not asleep when the run-off occurred; witness examined the track after day light came, and found sand only on one rail, and not more than six inches deep, and a few sound ties were torn up under the baggage car; that there were fifteen

or twenty ties torn up, but they were old ones; saw no new ties at the place; that witness, up to 26th of August, 1871, was employed by defendants as private secretary and manager of the road, and so continued until August, 1872, and had been general agent, of the road whilst McComb was president; that the track was not widened or spread by the run-off, but the whole bed was moved to the right hand, by the momentum of the engine, after it had mounted the sand; and that the rails and cross-ties there, were all good.

*P. McCanliff*, for defendants below, testified:

That he was road master, when the engine ran-off, Bloxum, the section boss, being competent, and not discharged for three or four months after the run-off; that witness knows the (then) condition of the road at that place, having seen it six hours before the event; that he passed down the evening after the accident, with a train, on a side-track constructed around the wreck, with the same timbers that had been taken from the road bed, where the run-off took place; that the ties, where the engine ran-off were sound and good; that it is the duty of the road master to see that the road is in good order; that witness had been on this road about eighteen years, and knows superintendent Williams to be competent and careful in selecting hands; that the ties were just as good at the place of the accident, as at any other place on the road; that there may have been a small pile of wood near the wreck, but the regular wood yard was not at that place; sand had washed on the road that night and *that* always occurred when a hard rain came, and was generally known to the engineers; that witness is of opinion that the run-off was caused by the sand on the rails, and *not* by rotten ties; (witness declined to answer the question as to what was his *present* business, and was excused;) that witness left the road because they stopped his pay, and told him they had no further use for him, but he was not discharged for drunkenness, (although he drinks constantly,) that being a *first point with railroad men.*

*T. S. Williams*, witness for defendants, in his deposition, testified:

That he lives in New Orleans, and has known the plaintiff Hughes twelve or fifteen years, and Hughes was engineer, in the employ of defendants; that witness was general superintendent of the road, when the run-off occurred; that the run-off occurred at a point a mile and a half north of Crystal Springs, on high, but sandy ground; that the engine was damaged, and the baggage car badly smashed; that the first time witness saw plaintiff after the run-off, witness asked him how he could have made so great a mistake, and witness replied that he did shut off steam, and I think he said that he was nearer the cut than he had supposed, but of this I am not sure; that witness learned from all parties including plaintiff, that the previous night's rain had washed sand on the track; that no special instructions had been given to engineers as to the mode of passing this particular spot; that it was the duty of the engineer to know all dangerous places, and to run over them carefully; that plaintiff had been engineer on the road for three or four years previous to the run-off; witness cannot say that plaintiff was guilty of negligence in running the engine off of the track, but he was not sufficiently cautious, and he admitted that he had ground to apprehend danger at that point; slides of sand, after rains, were common at this and other points on the road, and plaintiff had the means of knowing this fact. From all the facts of the case and his knowledge of the affair, witness cannot say that this run-off was the result of negligence on the part of plaintiff, but he may have made a mistake as to *distance*. The fact that he shut off steam, shows that plaintiff was on the lookout and trying to be cautious; witness considers that plaintiff was one of the best engineers on the road, and he was steady and faithful; witness was far from the place where the run-off took place, and can say nothing, of his own knowledge, about the rain and washing of sand; sand on the road could only be seen a short distance at night, not in time to check up; this ac-

cident occurred in a curve; it was the duty of the road-master and section boss to keep the road in order, and give notice to trains of all danger. Witness did not know that the road needed new cross-ties at this place.

*Joseph Vallier*, whose deposition was read by defendants, states:

That he has been an engineer on railroads for two years and a half, and is thirty-two years old, was in the employment of defendants in the years 1868 and 1869, and has known plaintiff four and a half years on defendants' railroad; that, at the time this run-off took place, the road there was in tolerable good condition, but was covered by sand five or six inches deep; witness does not know whether the cross-ties at the place were sound or rotten, but it was unsafe there for passenger trains, the sand had been on the rails for two or three hours before the accident; this accident was caused by the accumulation of sand on the rails; plaintiff is a competent, steady and skillful engineer; witness saw the sand on the rails, but did not examine the ties, so as to know whether they were sound or rotten; that plantiff knew of the cut in the road as well as myself; witness was fireman for Hughes and on the engine when the train ran off; it was raining hard at the time, with thunder and lightning; the run-off was caused by the sand on the rails; Hughes (plaintiff) is a skilful engineer, and very careful; the train would have gone along but for the sand, that was the sole cause of the accident; it was so rainy, dark, smoky and foggy, that it was impossible to see through the head-light and observe sand on the road.

*Nich. Greener's* deposition was then read by defendants below. He states:

That he was in the employ of defendants at one time, and left their service the last of November, 1869; that witness was in the sleeping car at the time of the run-off; that witness examined the road after the run-off and found it good

and safe; the run-off was caused by sand on the track; Hughes, the plaintiff, is reported to be a good engineer; the place where the run-off occurred is not *noted* as a bad place on the road; it is the duty of the engineer to run cautiously after hard rains, and plaintiff Hughes, if his head light had been in order, and he had been running with care, *might* have checked up before he got to the sand. Witness ran a train through that place the evening before the run-off, and saw nothing the matter with the track. Witness is a regular engineer, learned his trade fifteen years ago, and had been practicing as an engineer twelve years before this accident took place.

*James Colquhoun*, for defendants, testified as follows:

That he has been conductor on railroads fifteen years, and has been twice thrown from the track by an accumulation of sand on the track, of the depth of three or four inches, and 200 feet long, and that such sand was the cause of that run-off; that witness is no engineer, and knows nothing about the run-off in this case; that the accidents, or running off, I speak of, occurred on an up-grade about thirty feet to the mile, the road being straight.

*Robert Miles*, for defendants, says:

That he has been engineer on a railroad (M. C. R. R.) for ten years; witness has run off in consequence of an accumulation of sand on the rails from three to five inches deep; that sand will not cause the track to spread; has known engines to mount sand-banks and stick there, without leaving the track; that the engineer's window is generally closed when it is raining; that it is the duty of engineers to *tie up* in very bad weather.

*Charles M. Owen*, for defendants, testified:

That he has been an engineer on the road of defendants, and other roads, and has observed the effect of sand on the track on passing locomotives; that witness' engine was once

thrown off by sand from six to ten inches deep, but has, at other times, run safely through sand two feet deep, the sand being simply a loose bank; witness knows the road where Hughes ran off, it is a cut, where sand always washes down with hard rains; that plaintiff is a number one engineer, sober, diligent and careful; sand five or six inches deep on one side will throw an engine off the track.

*John Hawkins.*, for defendants, says :

That he has been railroad engineer many years, and knows the place where this accident occurred, pretty well, but has not seen it for ten years; that witness has observed the effect of accumulated sand on rails, upon an approaching engine, but although he has known engines to *mount* sandbanks, and stop, he has never known one to be thereby thrown off the track; has known engines to run so deep in sand banks, as to be blockaded and ditched out, but they did not leave the rails. Witness has known plaintiff as fireman, engineer and conductor. Witness never knew of a train being thrown off the rails by a sand-bank.

*John P. Hughes*, plaintiff, in rebuttal, said :

That he never told George Moorman, or anybody else, that the sand threw his engine from the track—never told any passenger so; knew, indeed, always, that sand did not throw the engine off, but the cause really was the rotten ties in the road-bed. In reference to T. S. Williams' deposition, he deposed that he (witness) did converse with Williams, at his office in New Orleans, in reference to this runoff; that Williams then said to witness, you are the last engineer I would have supposed to run off; and witness replied, stating that the cross-ties were rotten at the point, causing the track to spread, and thus threw the engine off; that witness never did say to Williams that he (witness) was really nearer the dangerous place than he (witness) had supposed; witness did tell Williams that he (witness) had shut off steam, to get wood at the steam shovel, and Wil-

liams found no fault with witness, nor did he admonish him to be more cautious; that witness is friendly with the witness, Mr. Williams, and considers him to be a truthful gentleman; that witness is not on friendly terms with witness, George Moorman, and knows but little about him, but Moorman is very bitter against witness, and told witness that he (Moorman) would see that witness should have no place on any railroad, and that he (Moorman) would work witness out of every place on any road in the interest of McComb; since witness began this suit, Moorman has threatened that he should never have a place on any road.

*Thomas Shackleford*, in rebuttal, was introduced by defendants, and testified as follows:

I have often heard George Moorman express kind feelings for Hughes; the plaintiff, Moorman, has tried to get a place for said Hughes on defendant's road. I think that Moorman has kind feelings for Hughes; it may be that Moorman's efforts to get Hughes a place was in view of compromising this case, but I do not *know* as to that.

The following are assigned as errors in the judgment and proceedings of the court below:

1. The court erred in overruling the motion for a continuance, made at the September term, 1872, of the court.

2. The court erred in sustaining the objections taken to the deposition of T. S. Williams, and in refusing to allow parts of that deposition to be read.

3. The court erred in not allowing the deposition of T. S. Williams to be read as it was taken and offered.

4. The court erred in giving the instructions for defendant in error, and in refusing to give the third, eighth, tenth, eleventh and twelfth instructions asked by plaintiff in error, and in modifying the fifth and sixth instructions.

5. The court erred in sustaining the objection to the question asked George Moorman, a witness for plaintiff in error.

6. The court erred in overruling the motion for a new trial.

7. The court erred in overruling the demurrer to the declaration.

*A. H. Handy and W. P. Harris,* for plaintiff in error.

The company is not liable to the defendant as employe of the company, for the negligence of another employe with whom he is intimately connected in the discharge of their respective duties, the efficiency of the performance of the engineer's duties being greatly dependant upon the conduct of those charged with the duty of keeping the road and track in good and safe condition. They are fellow servants of the company employed in the same business, the safe and efficient running of trains. Farwell v. The Boston & Wor. R. R. Co., 4 Metc., 49, 59, 60; Wheeler v. Mad. R. R., etc., 8 Ohio, St., 256; 1 Seld., 492, 494; Brown v. Maxwell, 6 Hill, (N. Y.,) 594; Wright v. N. Y. C. R. R., 25 N. Y. 562, 564; Rohbach v. Pacific R. R., 43 Mo., 194, 195; 1 Redfield on R.R., 531, 532; Shearm. & Redf. on Neg., §§ 88, 100.

A master is not liable to his servant for the negligence of a fellow servant, while engaged in the same common employment, unless he has been negligent in the selection of the servant in fault, or in retaining him after notice of his incompetency. The master does not warrant the competency of any of his servants to the others. Shearm. & Redf. on Neg., (20 ed.,) 86; Tarrant v. Webb, 37 Eng. C. L. & Eq., 281–286. Such a company must necessarily depend on agents and servants to do its work, and all that it can do in that respect, is to act in good faith and employ agents whom they think competent. In this they are bound to use only ordinary care. Ib., § 90. And the mere fact of the incompetency of the servant, for the work on which he was employed, is not sufficient to make the company liable for negligence in employing him. Ib., 90. And the particular negligence of a fellow servant which caused the injury, is generally not sufficient evidence of his incompetency, and is certainly not sufficient to raise a presumption of notice to the master. Ib., 91. If the plaintiff was aware of the in-

competency of his fellow servant, through whose negligence he suffered injury, it was his duty to notify the company; and in the absence of such notice he cannot recover damages from the company for such injury.

Plaintiff, himself, at the time of the accident, did not use proper caution in running the train. It is not essential to the defense that he should have been the cause of the disaster by which he was injured. It is enough to defeat him, if the injury might have been avoided by an exercise by him of ordinary care. The question is whether the plaintiff's negligence contributed to the injury of which he complains. Shearm. v. Redf., Neg., (2d ed.,) § § 25–29; Dix v. Brown, 41 Miss., 135–136.

The statute of this State, (Rev. Code of 1857, p. 299, art. 43; Code of 1871, § 2429,) in reference to suits against railroad companies, for injuries received from neglect or mismanagement of agents, engineers, clerks, etc., does not apply to the present case. It relates merely to suits by strangers disconnected with the road and its service. It was intended to make the rule of *respondeat superior*, applicable to all such cases, and to remove doubts as to whether in many cases affecting the rights of strangers, that rule was applicable to railroad companies for many acts of their agents, of a tortious character. Patton v. Vicksburg & Jackson R. R., 31. Miss., 156; Sullivan v. Miss. & Mo. R. R., 11 Iowa, 428. A statute is to be construed by the principles of the common law, and in reference to it; and it is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required. Dwarris on Stat., 695. That the statute has no reference to this case, see Carle v. Bangor Co., 43 M., 269–271; Sullivan v. Miss. & Mo. R. R., 11 Iowa, 421–428; Rohback v. Pacific R. R., 43 Mo., 194–195; Iowa Stat. 1853; 25 N. Y., 564–566; 1 Seld., 492–494; 6 Hill, 594; King v. Barton, 9 Cush, 112.

*Johnston & Johnston and T. J. & F. A. R. Wharton,* for
defendant in error :

A new trial will not be granted because the court refused
to give a correct instruction, if the verdict be clearly right
according to the evidence, and should not have been differ-
ent if the instructions had been given. 11 S. & M., 169;
13 ib., 532; 30 Miss., 504. An improper qualification made
by the court to an instruction asked, is no ground for a new
trial, if the benefit of the rule of law claimed in the instruc-
tion, be secured to the party asking it by another instruction
which is given, and which fairly and fully presents the rule
to the consideration of the jury. 39 Miss., 342. All the in-
structions must be construed together, and if the law be
correctly expounded by that rule, the judgment will not be
reversed because one instruction, taken by itself, was too
broad. 36 Miss., 77; 44 ib., 762.

The amount of damages found by the jury was correct,
according to the rule laid down in Whitfield v. M. & C. R.
R., 44 Miss., 466; 23 Penn., 526; 2 Redf. R. R. Cas., 466.

While greater strictness and more careful attention is re-
quired of railroad companies for the protection of passengers
than of its employes, still, they are required to exercise rea-
sonable care in the construction of their roads, in having
good road-beds, sound cross-ties, safe iron, good, substantial
locomotives, thoroughly competent, faithful, sober and atten-
tive employes in every department; and this is the case not
only in the outset, and in the outfit and equipment of the
road, but a rule continuing every day and every hour there-
after; otherwise they will be liable to employes for injuries
sustained through the negligence of fellow-servants. The
company had been actually notified of the bad condition of
the road at the place where the accident occurred, and were
guilty of gross negligence, for which they will be held liable.
8 Allen, 441; 28 Vt., 61; 4 Seld., 175; 4 Ohio, 575; 20 ib.,
415; 42 N. H., 220; 45 Ills., 197; 55 ib., 492; 5 Ind., 339;
7 ib., 436; 3 Cold., 222; 2 Duval, 114; 10 Gray, 275, 282;

48 Me., 113; 27 Vt., 377; 11 Wis., 239, 251; 1 Am. R. R. Cas., 569; 2 Hilliard on Torts, 465, 466, § 24; 12 Ohio, 475; 42 N. Y., 275.

Public policy requires that the employe of a railroad company should be entitled to the same protection against injury by other employes which the law affords to other persons. 20 Ohio, 415, 450; 5 Ind., 340; 7 Port. (Ind.), 436; 1 Am. R. R. Cas., 569; 3 Head, 642; Barker v. Midland R. R.; 36 E. L. and Eq., 253; Coone v. Powe, 7 Metc., 596. It is the duty of railroads to keep their road in such repair, and so watched and tended, as to insure the safety of all who may lawfully be upon them, whether passengers, servants or strangers. 45 Ills., 197; 28 Vt., 62; 42 N. H., 230.

This is at most a case of conflicting testimony, in which the verdict of the jury must prevail. Verdicts will not be disturbed on the ground of a lack of evidence to support it, unless there be a clear preponderance of evidence against them. Brown v. Forbes, 8 S. & M., 498; Sims v. McIntyre, ib., 324; Peck v. Thompson, 23 Miss., 367; Garland v. Stewart, 31 Miss., 314; Gay v. Lemle, 32 ib., 309.

Simrall, J., delivered the opinion of the court:

The question chiefly discussed at the bar was, whether a servant could recover from his master, for injuries resulting from the carelessness and negligence of a fellow servant engaged in a common business, and if so, under what circumstances.

At this day, associations of numerous persons and their capital undertake and conduct many of the great enterprises. Whether united into partnerships or corporations, they require a great number of subordinate agents and employes. The corporation being an ideal personage, conducts its affairs exclusively by agents and servants. To a very large degree, capital has been brought together in incorporated companies for purposes of mining, manufacturing and transportation of freight and passengers; for which individual means would be wholly inadequate.

The internal transportation of products and passenger travel is mainly performed by the railroad companies. These, deriving their corporate existence and powers from the States severally, have, from the exigencies of intercouse and commerce, so knit together as to become a system common to the whole country. Their duties and responsibilities to the public, as carriers, are matters in which the whole community is interested, and rest upon grounds of expediency and policy. So vast has grown to be the multitude of their servants and employes, in constructing, repairing and operating the roads, contributing in such various capacities to carry forward its business, that it may be also said that the community have an interest in those rules which define the relations of the employes with each other, and with their common master, the railroad corporation. On account of the pervading influence, direct and remote, which any rule may have, the subject increases in gravity and importance.

It must be assumed that the servant takes upon himself the natural and ordinary perils incident to the business about which he is employed. Where many are co-operating in a common enterprise, the risk and exposure of each, is increased. If several are engaged in the same work, although their duties are distinct, one employed on one part and another on another, yet the united labor of all, being necessary to carry it on to completion ; it is a fair inference that each employe estimates the exposure to danger incident to the continuation of the many, and undertakes the risk. Such perils are indeed ordinary, and necessarily belong to the business. Each for himself takes into the account his exposure, from the want of prudence and caution from every other. There is no trouble in apprehending the fitness and propriety of the principle, where the work to be done is concentrated, and the employes are kept in close contact, as where the eye and ear may command the scene of operations and detect the imminent danger. But where the work is vast and ramified, like a railroad stretching across degrees of latitude, requiring the services of hundreds, and perhaps

thousands of employes, of every degree of skill and intelligence, from the ordinary laborer, to the machinist and the man of high scientific attainments, and when these employes are so numerous and widely scattered that few can know each other; the mind pauses and reflects, before assenting to the proposition, that each individual who enters the service of such a corporation, takes the risk of the prudence, and carefulness of every other engaged in its multiplied duties, and department of business. The mind readily assents that such risk ought to be incurred as respects those associated in the same line of duty and in the same department of business. Yet, whilst this may be so, such intrinsic difficulties arise, in making the classification, that a great jurist has declared that it has been impossible to frame a rule of practical utility.

The general principle which prevails in England, and in most of the American States, is, that a servant accepting employment for the performance of specified duties takes upon himself the natural and ordinary perils incident to the service, of which, are exposures from negligence of fellow-servants in the same common employment. Priestly v. Fowler (in 1837), 3 Mees. & Welb., 1, is the first and the leading case in England. There the servant was injured by the breaking down of a saw. It was stated by the Chief Baron that there was no precedent for the action, but it must be decided by general principles, with reference to the consequences of a decision one way or the other. Whilst the master was bound to provide for the safety of his servant in the course of his employment, negligence must be brought home to him before he is liable. The first case in this country was Murray v. R. R. Co., 1 McMillan, 398 (in 1841), a fireman was seriously hurt by the conceded negligence of the engineer. Lord Abinger's judgment in Priestly v. Fowler was not brought to the notice of the court, but the same conclusion was reached from similar considerations. The relations of the parties and their relative duties are thus stated: Where there are several servants or agents, " each stipulates for the performance of his several part." They

are not liable to the company for the conduct of each other, nor is the company liable to one for the misconduct of another." Next followed the case of Farwell v. R. R. Co., 4 Metcalf, 49, when the subject received the careful consideration and approval of that great jurist, Ch. J. Shaw.

Until 1837, no case had arisen in England, of a servant seeking redress from the master for injuries sustained in the course of his employment, because of the negligence or misconduct of a fellow servant. The first instance in this country, of such an action, and that at the suit of the employe of a railroad company, is that of Murray v. R. R. Co. (*supra*). It may be remarked of this case, that it was thoroughly argued at the bar, as an action new in the instance, depending upon considerations of policy, the consequences to flow from the decision, one way or the other, furnishing the surest test of the judgment that ought to be pronounced. The reasoning of the court is a comparison of the influences, whether for good or evil, that would ensue, to the employes of the company, the railroad corporation and its business, by sustaining or overruling the suit.

The general doctrine of these cases has been uniformly followed in England and in most of the States. These are some of the more prominent cases: Hutchinson v. T. & N. & B. R. R. Co., 5 Exch., 343 ; Skip v. Eastern Counties R. R. Co., 24 Eng. L. and Eq., 396 ; Brown v. Maxwell, 6 Hill (N. Y.), 592 ; Frazier v. P. R. R. Co., 38 Penn. St., 104 ; Ryan v. C. V. R. R., 23 Penn. Rep., 384 ; R. R. Co. v. Bacon, 6 Porter (Ind.), 205 ; Carle v. B. & P. C. R. R. Co., 43 Maine, 269 ; Ind. R. R. Co. v. Love, 10 Ind., 554.

In Ohio and Kentucky the courts have modified the rules, so as to fix liability upon the company, where the servant injured was under the control of a superior who was guilty of negligence. Railroad Company v. Stephens, 20 Ohio Rep., 415 ; Railroad Company v. Keary, 3 Ohio St. Rep., 201 ; subsequently in Railroad Company v. Barber, 5 Ohio State Rep., 557. These decisions were revised and held not to apply in any instances than those where there existed at the

time of the injury, a subordination of authority, and the superior, by his negligence or mismanagement, caused the injury. That was the case of a conductor, complaining of injury on the train under his own control. See also Louisville and Nashville R. R. Co., ads. Collins, 2 Duvall, 114.

In the case under consideration, the running off of the train, which precipitated the plaintiff, who was the locomotive engineer, to the ground, and injuring him, was caused by an accumulation of sand on the road-bed, or the spreading of rails by their separation from rotten cross-ties. Just before the accident, there had been a heavy fall of rain; the night was dark and stormy. The *place* was a deep cut, known to be subject to sand slides and washing from the adjacent banks, from heavy rains. There was evidence tending to show that the casualty may have been caused by accumulation of sand on the track; or that it may have been caused by the rotten cross-ties; or both may have contributed to it. If the misfortune was attributable to the unsafe condition of the road, from defective and rotten cross-ties, the question arises, What is the responsibility of the company? The road is under a duty, imposed by its charter, to "repair" its road; to keep it in condition to subserve the purposes for which it was constructed. It is under a duty also to select competent agents to discharge the several kinds of service committed to them. It must bestow ordinary care and diligence in the repair of the road, and in selecting its agents. Where the law, or the nature of a business, devolves a duty upon a party, the fair presumption is that he performs it. If an action is grounded upon negligence or non-performance of it, the plaintiff must show the default. If the injury result from the negligence or misconduct of an agent of a railroad company, liability on the company can be imposed by showing incompetency of the agent, and the want of reasonable care and prudence in his selection, or his continuance in place after notice of his unfitness.

A railroad company, like a natural individual, is responsible for injuries proceeding from its own negligence or mis-

conduct. It was the duty of the section boss and road master to keep the road in suitable repair. If these agents negligently performed their duty, and the company were advised of it, then the default became its own, and it must take the consequences.

Who are "fellow-servants" within the rule? Those who are co-working in the same common enterprise, under the same master and compensated by him. Difference in wages or work do not affect the question, if the general business is the same. The conductor, engineer, brakesman, and firemen are fellow-servants with the same employes on every other train. So they are with the switch tenders, the track repairer, or watcher of trains to give signals, is in a common employment with the engineer, conductor and firemen of a train. Hard v. Vermont and Canada R. R. Co., 32 Rev., 472; Wilson v. Madison, etc., R. R. Co., 18 Ind., 226; Poston v. R. R. Co., 4 Jones (N. C.), 246; Slattery v. R. R. Co., 23 Ind. Rep., 81; Coon v. R. R. Co., 5 N. Y., 492.

It was pressed at the argument, that art. 43, Code 1857, p. 299, furnished a statutory rule, as respects negligence, which withdrew the case from the general rule drawn from the analogies of the common law. That statute is declaratory of the common law, as to railroad companies' responsibilities to the public. The negligence of any of its agents or servants, whereby injury is inflicted upon or wrong done to a "stranger," gives him a cause of action against the company. Without indulging in a philosophical criticism of the language, so as to determine its meaning, we are content to accept the construction put upon it in other States, where a similar statute obtains; that is, that it does not embrace, nor was it so intended, the agents and employes; but they stand upon their common law rights. Sullivan v. M. and Mo. R, R. Co., 11 Iowa, 421; Carle v. B. and C. and R. R. Co., 43 Maine, 269. In the case reported in 11th Iowa, the court held, that where different persons are employed by the same principal in a common enterprise, no action can be brought by them

against the employe, on account of injuries, sustained by one, through the negligence of another employe. After that decision (in 1862), the Legislature passed a statute making the railroad companies liable for all damages sustained by "any person," in consequence of the neglect of its agent or its managers, *including employes of the company.* In the later case of Hunt v. C. and N. W. Railroad Co., 26 Iowa, 370 (in 1868), the court ruled, that the express words "including employes" gave them the action, like a stranger, which they did not have before.

The theory of law, upon which the circuit court proceeded, did not accord with what we have ascertained from an examination of the cases, to be the rule in England, and in the great majority of the States. It is a matter of great moment, not to be overlooked by this court, that in view of the ramification of the railroad system, through the States, and the homogeneity of interest common in all the States, that the rules of law, pertaining to their duties and responsibilities, should be as nearly uniform as possible.

The first instruction assumes that the plaintiffs can recover if the injury may be referred to the carelessness of other agents and servants of the defendant, employed in a department distinct from that in which the plaintiff was engaged, and over whom he had no control.

If the mischief may be attributed to the section boss and road master charged with the duty of repairing the road-bed, and giving to trains signals of danger, because of a failure to perform them, these servants not being under the plaintiff's control, then the instruction is, that the recovery may be had. In Coon v. R. R. Co., 1 Seld. Rep., 492. The plaintiff's business was to repair the road and inspect the track; he was injured by a passing train; held that he could not maintain the action, because of the negligence of those running the train. This case seems to directly negative the proposition contained in the instruction. In Ohio, where the distinction and classification of the employes was first made, as affecting the responsibility of the company, it was held

(in 1858), in Whatan v. R. R. Co., 8 Ohio, St., 253, that a laborer engaged in repairing the road, could not recover for an injury sustained, in consequence of the carelessness of a fireman on the locomotive.  The distinction was pressed at the bar, that the respective servants were engaged in distinct departments of duty; the court, referring to the antecedent cases, declined either to adopt or reject the distinction, but placed their judgment on the ground that both servants were in such relation to each other, as brought them within the general rule.  Also Hayes v. Western R. R. Co., 3 Cush., 270, Albro v. Agawam Canal Co., 6 Cush., 75; Wyman v. Jay, 5 Exch., 352.

The third instruction rests upon the same erroneous conception of the law as the first.  It declares that the risks taken by the locomotive engineer does not extend to the negligence of employes in other departments.  See Bola v. N. Y. Central R. R. Co., 18 N. Y., 432; Hutchinson v. York and New Castle R. R. Co., 5 Exch. Rep., 343; Abram v. Reynolds, 5 Hurt & Norris, 142; Wright v. N. Y. Cen. R. R. Co. 18 New York, 565.

The court refused instructions requested by the defendants, the converse of those granted for the plaintiff, such as the twelfth, which was error.  The tenth instruction asked by defendant ought to have been given.

The third and fifth charges asked by the defendant, propounded the law correctly, as to the degree of care incumbent on the company in the selection of the servants therein named; and, taken in connection with the tenth prayer for instruction, which states, "if they become incompetent afterwards, such incompetency must be brought to the knowledge of the defendant, ought *not* to have been given, and could not have misled the jury.  The three requests, taken together, affirm that if the defendant exerted due care in making the appointments, and afterwards, they, or either, became incompetent, and defendant was aware of it, then if the plaintiff was injured because of their neglect,

the defendant is liable. The company then becomes derelict in its duty, and must be held to account for all the consequences. If the railroad company continued, knowingly, an incompetent servant in its service, especially in a position of importance, it should be required to assume all the consequences that may be fairly traced to his incompetency. And since each employe takes the risks of the negligence of every other one, it is the plain duty of any one of them to give information to the employer, of the incompetency or unfitness of a fellow-servant, and if he is aware of the negligence or incompetency of a particular employe, and withholds such information, and suffers by his negligence, he ought to be precluded from recovery from the master. The ultimate foundation of the rule of the non-liability of the master for the negligence of his servant, is upon policy. Whether the safety of the agents and employes of a vast enterprise like a railroad company would not better be consulted, by making it the interest and duty of each one to observe the conduct of the other, so as to be associated, as far as practicable, with the prudent and cautious. Brought, as they are, in constant contact with their fellows, they have better opportunities to know and judge of the qualifications and fitness of their associates in the common business, than the defendant. It must also be considered whether vast interests of railroad transportations, of manufactures, of mining, and navigation could be, for the public, as promptly and safely conducted if there was no sort of responsibility resting on the employes and operatives for each other's conduct and good behavior. They have also the further safeguard that the corporation must use due care and diligence in the selection of its agents; and upon discovery of their unfaithfulness to duty, must promptly remove them. Of delinquencies, the employes have equal, perhaps better, means of knowledge than the company. Railroad companies are under the strictest liabilities as carriers of freight; nothing excuses but the act of God or the public

enemy.  They must exercise all possible care for the safe carriage of passengers.  These stringent duties have been put upon them from motives of policy.  They will not be heard to excuse themselves because their agents have been unfaithful or careless.  The experience of the most active commercial and manufacturing countries of Europe, and of nearly all the commercial, mining and manufacturing States of the Union, after a trial of over thirty years, concur in the wisdom and expediency of the application of the rule to the employes of railroad corporations.  It might, in individual instances perhaps, work hardship ; hence the courts of two of the States have attempted to limit its operation.  It seems to us, then, there are intrinsic difficulties in the way of a classification of a safe and uniform application.  There are doubtless instances of employes, as suggested in C. & A. R. R. C. v. Murray, 53 Ill., 336, so separated from the other employes, so disconnected in duty, that such a one ought to be exempted out of it.  Nor, on the other hand, would we undertake to say, in advance, that there might not be officers clothed with such special authority, and filling such special relations to the company, as, that the corporation should be esteemed as present with them, commanding and acting, so that it may be made amenable to subordinate servants.  This is not a case of that sort, but we throw out the suggestion, but without committal one way or the other, in order to prevent the views here expressed from being carried beyond the range of their fair applicability.  There are errors, as we have indicated, in the granting and refusal o instructions.  Wherefore the judgment is reversed, caus remanded, and a *venire facias* awarded.